**UNITED STATES of America,
Plaintiff–Appellant,**

v.

**Donald Albert MASSIE and Carson
Lewis, Defendants–Appellees.**

**No. 95–2030.**

United States Court of Appeals,
Tenth Circuit.

Sept. 11, 1995.

Rehearing Denied Oct. 12, 1995.

---

Vicki S. Marani, Attorney, Criminal Division, Department of Justice, Washington, DC (John J. Kelly, United States Attorney, Albuquerque, NM, with her on the brief), for plaintiff-appellant.

Carmen E. Garza (Stephen Stevers, with her on the brief), Las Cruces, NM, for defendants-appellees.

Before TACHA, SETH, and BALDOCK, Circuit Judges.

BALDOCK, Circuit Judge.

The government appeals the district court's grant of Defendants Donald Albert Massie's and Carson Lewis' motion to suppress evidence seized from their car during a border patrol checkpoint stop. We exercise jurisdiction pursuant to 28 U.S.C. § 1291 and reverse.

On June 23, 1994, Defendants pulled into the border patrol checkpoint on Interstate 10 near Las Cruces, New Mexico. After verifying Defendants were United States citizens, Border Patrol Agent Guillermo Torres asked Massie if he owned the car he was driving. Massie replied "Yeah" and then stated "No, it's a rental car." Agent Torres asked Massie for the rental agreement or other documentation. Massie searched for the rental agreement, but could not find it. Agent Torres asked Massie where he was coming from. Massie said he was coming from Nacogdoches, Texas, then stated "No, I'm coming from Dallas, Texas." Agent Torres directed Massie to the secondary inspection area. At this point, Massie and Lewis had been in the primary inspection area for approximately one minute.

Accompanied by Agent Brian May, who had been with him in the primary area, Agent Torres advised Agent Michael Dalton he suspected the car might be stolen. Agent Torres asked Agent Dalton to investigate further. Agent Dalton proceeded to the secondary area and asked Massie if he had any documentation on the car. Massie handed him a rental agreement, which indicated the car had been rented to Barney Lawrence. Agent Dalton did not notice that the rental agreement specified Massie was an additional authorized driver of the car.

Agent Dalton asked Massie where he had come from. Massie replied that he had come from Fort Smith, Texas. One of the agents said he had never heard of Fort Smith and Massie replied that it was in the Dallas–Fort Worth area. Agent Dalton asked Massie what he had been doing there. Massie replied that he was visiting a friend. According to Agent Dalton, Massie appeared nervous during this exchange because he did not make eye contact and spoke in a loud voice.

Agent Dalton asked Massie who had rented the car. After a few seconds hesitation, Massie answered "Barney Lawrence." Agent Dalton asked Massie for his driver's license. Massie started searching for it and Agent Dalton asked him to step out of the car. Massie got out of the car and handed Agent Dalton his license. Agent Dalton asked another agent to watch Massie while he talked to Lewis.

Agent Dalton asked Lewis where he and Massie had come from. Lewis said they had come from Burleson, Texas, where they were visiting Lewis' brother. Agent Dalton walked back to Massie and asked him who he and Lewis had been visiting. Massie said "he didn't know, just a friend," but could not recall his name. When Agent Dalton asked if it was Lewis' brother, Massie replied, "Yeah. Yeah, I guess. Yeah."

Lewis' and Massie's demeanor caused Agent Dalton to feel "that there was something going on here" and made him "quite concerned" for himself and his fellow agents. Agent Dalton asked Lewis to step out of the car and produce some identification. Lewis produced a social security card and check-cashing ID. Agent Dalton was suspicious because he had seen fraudulent documents of that sort and did not consider them good identification.

Agent Dalton asked Lewis if there was anything in the trunk of the car. Lewis replied that there was nothing in the trunk. Agent Dalton asked Massie the same question and Massie replied "Yeah a suitcase. Our luggage." Agent Dalton asked Massie for permission to search the trunk. Massie consented. Agent Dalton opened the trunk and saw a black jacket, two black suitcases, and a blue hard-sided suitcase.

Agent Dalton suspected the suitcases contained contraband because Lewis said there was nothing in the trunk. He asked Defendants if the blue suitcase was theirs. Defendants replied yes. Agent Dalton sent Agent May to the checkpoint trailer to get the drug-detecting dog and asked Massie if he would allow the dog to sniff the car. Massie replied "No, I'm in a hurry. I don't want you to." Agent Dalton told Massie he was going to have the dog sniff the car anyway.

When the dog arrived, he alerted on the trunk. The agents removed all three bags from the trunk. The dog sniffed the bags and alerted on the blue one. The alert occurred seven to ten minutes after Agent Dalton directed Defendants to the secondary inspection site.

Agent Dalton asked Defendants again if the blue suitcase was theirs. Massie replied that they "actually found that suitcase." The agents asked Defendants if they knew what was in the suitcase. Defendants said no. The agents opened the suitcase, discovered marijuana and methamphetamine, and arrested Defendants. Agent May searched the car and found a loaded firearm, some knives, a set of handcuffs, a scanner, a cellular phone, and a small amount of LSD and methamphetamine.

Defendants were charged by indictment with one count of possession of marijuana with intent to distribute, 21 U.S.C. § 841(a)(1), one count of possession of methamphetamine with intent to distribute, 21 U.S.C. § 841(a)(1) and two counts of using and carrying a firearm during and in relation to a drug-trafficking offense, 18 U.S.C. § 924(c)(1). Defendants moved to suppress the drugs, firearm, and other evidence seized from the car.

Following a hearing, the district court granted Defendants' motion to suppress. The court found that Agent Torres' referral of Defendants to the secondary inspection site was justified. The court concluded, however, that once Defendants produced the rental agreement indicating Massie was an authorized driver of the vehicle, the agents had no further reason to suspect the car was stolen, and Defendants "should have been free to proceed on their way." Vol. I at 5.

In response to the government's argument that there were suspicious circumstances to justify the continued detention, the court noted that all the border patrol agents testified that the only reason Defendants were detained was that the agents suspected the car had been stolen. Because "[t]he car rental agreement ... plainly showed that the agents' suspicions that the car had been stolen were unfounded," id. at 11, the agents could justify continued detention of Defendants only upon reasonable suspicion of criminal activity. The court found "[n]othing about the demeanor of the Defendants" created reasonable suspicion of criminal activity, and therefore the agents' continued detention of Defendants "was unreasonable under all the circumstances and violated the Fourth Amendment." Id. at 13.

Because Massie's consent to search was given during the illegal detention and no intervening circumstances were present, the court concluded the government failed to show Massie's consent was voluntary. As a result, the court granted Defendants' motion to suppress the fruits of the illegal detention—*i.e.*, the evidence seized from their car. This appeal followed.

On appeal, the government contends the district court erred in granting Defendants' motion to suppress. Specifically, the government contends the district court erred in requiring the agents to demonstrate reasonable suspicion in support of the detention and questioning of Defendants after they were presented with evidence that Defendants' car was not stolen. The government maintains that under settled fixed-checkpoint precedent, the border patrol agents were entitled to briefly detain and question Defendants about the suspicious circumstances they observed. The government contends the agents' stop of Defendants was neither overly long nor intrusive and therefore did not exceed the scope of a routine checkpoint stop. As a result, the government asserts the district court erred in granting Defendants' motion to suppress. We agree.

■ In reviewing a district court's ruling on a motion to suppress evidence, we view the evidence in the light most favorable to the prevailing party and accept the district court's findings of fact unless they are clearly erroneous. *United States v. Johnson,* 895 F.2d 693, 697–98 (10th Cir.1990); *United States v. Morales–Zamora,* 914 F.2d 200, 202 (10th Cir.1990). "The ultimate question of whether a search and seizure was reasonable under the Fourth Amendment is a question of law that we review de novo." *United States v. Maestas,* 2 F.3d 1485, 1490 (10th Cir.1993).

■ We begin our analysis in the instant case by reviewing and contrasting the legal standards governing *Terry*-type investigative stops, *see Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), with the legal standards governing fixed-checkpoint stops. To conduct a valid *Terry* stop, a law enforcement officer must have an articulable, individualized, reasonable suspicion that an indi-

vidual is involved in criminal activity. *Id.* at 21, 88 S.Ct. at 1879–80. A *Terry* stop must "last no longer than is necessary to effectuate the purpose of the stop," *Florida v. Royer,* 460 U.S. 491, 500, 103 S.Ct. 1319, 1325, 75 L.Ed.2d 229 (1983), and its scope "must be carefully tailored to its underlying justification." *Id.; see also Terry,* 392 U.S. at 20, 88 S.Ct. at 1879 (scope of investigative detention must be "reasonably related in scope to the circumstances which justified the interference in the first place.").

■ At a fixed checkpoint, in contrast, border patrol agents may stop, briefly detain, and question individuals without any individualized suspicion that the individuals are engaged in criminal activity. *United States v. Martinez–Fuerte,* 428 U.S. 543, 562, 96 S.Ct. 3074, 3085, 49 L.Ed.2d 1116 (1976); *United States v. Rascon–Ortiz,* 994 F.2d 749, 752 (10th Cir.1993). "Border patrol agents have 'virtually unlimited discretion to refer cars to the secondary inspection area,'" *United States v. Sanders,* 937 F.2d 1495, 1499 (10th Cir.1991) (quoting *INS v. Delgado,* 466 U.S. 210, 224 n. 6, 104 S.Ct. 1758, 1767 n. 6, 80 L.Ed.2d 247 (1984) (Powell, J., concurring)), *cert. denied,* 502 U.S. 1110, 112 S.Ct. 1213, 117 L.Ed.2d 451 (1992), and may do so in the absence of individualized suspicion. *Martinez–Fuerte,* 428 U.S. at 563–64, 96 S.Ct. at 3085–86. "Whether the routine stop is conducted at primary, secondary, or both is irrelevant to Fourth Amendment concerns." *Rascon–Ortiz,* 994 F.2d at 753. "The principal protection of Fourth Amendment rights at checkpoints lies in appropriate limitations on the scope of the stop." *Martinez–Fuerte,* 428 U.S. at 566–67, 96 S.Ct. at 3087; *see also United States v. Ludlow,* 992 F.2d 260, 263–64 (10th Cir.1993) ("[A] routine checkpoint inquiry may properly take place at a primary inspection area, a secondary inspection area, or both as long as the scope of the inquiry is appropriate."). "A routine checkpoint stop [therefore] must be brief and unintrusive." *Rascon–Ortiz,* 994 F.2d at 752.

■ During a routine fixed-checkpoint stop, border patrol agents may question individuals in the absence of individualized suspicion about their citizenship and immigration

status and request documentation. *Rascon–Ortiz*, 994 F.2d at 752; *Sanders*, 937 F.2d at 1499. Agents may briefly question individuals "concerning such things as vehicle ownership, cargo, destination, and travel plans," *Rascon–Ortiz*, 994 F.2d at 752, as long as such questions are "reasonably related to the agent's duty to prevent the unauthorized entry of individuals into this country and to prevent the smuggling of contraband." *Id.* Agents may also make a cursory visual inspection of a vehicle. *Id.*

Additionally, if an agent observes "suspicious circumstances" during initial questioning, he "may briefly question the motorist concerning those suspicions and ask the motorist to explain." *Id.* at 753; *see also United States v. Chavira*, 9 F.3d 888, 889 (10th Cir.1993) (" 'Suspicious circumstances' justify a brief detention for further questioning."). While "there is no single or narrow definition" of a suspicious circumstance, *Sanders*, 937 F.2d at 1500, we have noted that "[a] 'suspicious circumstance' is not equivalent to the 'reasonable suspicion' standard." *Rascon–Ortiz*, 994 F.2d at 753 n. 6. Moreover,

> some deference is properly given to border patrol agents who, as law enforcement officers, are specifically trained to look for indicia of crime, with an emphasis on immigration and customs laws. So long as their interrogation bears a reasonable relationship to their unique duties, the judiciary is properly reluctant to interfere, and a reviewing court should only determine whether the suspicious circumstances as perceived by the border patrol agent are supported by the facts.

*Sanders*, 937 F.2d at 1500. We apply "a common sense view of the totality of the circumstances" to determine whether suspicious circumstances exist. *Id.* at 1501.

■ Thus, during a routine fixed-checkpoint stop a border patrol agent may ask questions reasonably related to his duties and explore suspicious circumstances, but must be brief and unintrusive. *Rascon–Ortiz*, 994 F.2d at 752–53. Further detention of an individual beyond the scope of a routine checkpoint stop must be based upon reasonable suspicion, consent, or probable cause. *Id.* at 753; *Sanders*, 937 F.2d at 1499. "Although consent is not required for a dog sniff of a lawfully detained vehicle ... it is required for continued detention beyond the lawful period." *Chavira*, 9 F.3d at 890 n. 1.

■ With these principles in mind, we conclude the district court erred by applying the wrong legal standards to the facts of the instant case. While the court correctly found Agent Torres' referral of Defendants to secondary justified, *Martinez–Fuerte*, 428 U.S. at 563–64, 96 S.Ct. at 3085–86, the court erred in concluding the agents had to have reasonable suspicion to continue to detain and question Defendants once they were presented with evidence the vehicle was not stolen. In so doing, the court erroneously applied the legal standards governing *Terry* stops to this fixed-checkpoint case and thereby erred in granting Defendants' motion to suppress.

■ Contrary to the court's conclusion, border patrol agents conducting a fixed-checkpoint stop are not limited to inquiring into suspicious circumstances related only to the initial reason for the stop or referral to secondary. *See United States v. Gonzalez–Acosta*, 989 F.2d 384, 387–88 (10th Cir.1993) (in stop at fixed checkpoint, agents not limited to inquiring into the immigration-related reason supporting the initial detention); *United States v. Espinosa*, 782 F.2d 888, 891 (10th Cir.1986) ("The Fourth Amendment does not require police officers to close their eyes to suspicious circumstances."); *United States v. Lopez*, 777 F.2d 543, 547 (10th Cir.1985) ("The law does not require the police to ignore evidence of other crimes in conducting legitimate roadblocks...."); *cf. Terry*, 392 U.S. at 22, 88 S.Ct. at 1880–81 (scope of investigative detention must be reasonably related in scope to circumstances underlying the initial detention); *United States v. Millan–Diaz*, 975 F.2d 720, 722 (10th Cir.1992) (in roving patrol stop, agents had to have reasonable suspicion to further detain defendant once the immigration-related reason supporting the initial detention was dispelled). Instead, agents can inquire into any suspicious circumstances they observe during routine questioning at a fixed checkpoint stop, as long as the agents' questioning bears "a reasonable relationship to

... [their] unique duties." *Ludlow,* 992 F.2d at 264 (quoting *Sanders,* 937 F.2d at 1500). Agent Dalton was therefore entitled to question Defendants at secondary about "vehicle ownership, cargo, destination, and travel plans," *Rascon–Ortiz,* 994 F.2d at 752–53, and inquire into any suspicious circumstances he observed, as long as the detention remained brief and unintrusive. *Id.* at 753.

■ Applying a common sense view of the totality of the circumstances, *Sanders,* 937 F.2d at 1501, there is ample evidence to support the agents' determination that suspicious circumstances existed to justify their continued detention of Defendants. Massie and Lewis gave conflicting answers as to where they had come from. Massie told the agents they had come from Nacogdoches, Dallas, and Fort Smith, Texas; Lewis said they had come from Burleson, Texas. *See United States v. Preciado,* 966 F.2d 596, 598 (10th Cir.1992) (difficulty recollecting basic details about one's travels can be suspicious circumstance). Massie appeared nervous because he would not make eye contact with Agent Dalton and was speaking in a loud voice. *See Rascon–Ortiz,* 994 F.2d at 753 (nervousness can be suspicious circumstance). Massie and Lewis could not agree on who they had been visiting. Lewis said they were visiting his brother; Massie said they were visiting a friend, whose name he could not recall. Lewis produced identification Agent Dalton found suspect. Finally, Massie and Lewis gave conflicting answers when asked what was in the trunk of the car. Lewis told Agent Dalton there was nothing in the trunk; Massie told Agent Dalton the trunk contained luggage. Affording appropriate deference to the agents' determination, *Sanders,* 937 F.2d at 1500, we conclude under the totality of the circumstances, suspicious circumstances existed to justify the agents' continued detention and questioning of Defendants.

■ We further conclude the agents' continued detention and questioning of Defendants did not exceed the confines of a routine checkpoint stop. The agents' questioning lasted only eight to eleven minutes[1] from the time Defendants were stopped at primary to the moment the dog alerted on the trunk. The agents' questions were not overly intrusive. The agents questioned Defendants about citizenship, vehicle ownership, vehicle contents, destination, and travel plans, each of which bears a reasonable relationship to the agents' duties. *Sanders,* 937 F.2d at 1500; *see Rascon–Ortiz,* 994 F.2d at 752; *Ludlow,* 992 F.2d at 265 n. 4 ("Questions regarding ... the contents of the vehicle were of course directly related to the Border Patrol agent's duties."). Thus, because the checkpoint stop in the instant case remained brief and unintrusive, it did not exceed the scope of a permissible routine checkpoint stop. *See Rascon–Ortiz,* 994 F.2d at 753. As a result, the district court erred in concluding the agents had to have reasonable suspicion to continue to detain Defendants after they were presented with evidence that Defendants' car was not stolen. *See id.* (reasonable suspicion necessary to detain defendant only if scope of routine checkpoint stop exceeded).

■ While Defendants were lawfully detained, the dog alerted on the trunk and the blue suitcase, thereby affording the agents probable cause to search. *Chavira,* 9 F.3d at 890. Because they were lawfully detained, Defendant Massie's refusal of consent to the dog sniff was irrelevant. *See id.* at 890 n. 1 ("[C]onsent is not required for a dog sniff of a lawfully detained vehicle...."); *see also United States v. Place,* 462 U.S. 696, 707, 103 S.Ct. 2637, 2644–45, 77 L.Ed.2d 110 (1983) (dog sniff does not constitute a search). As a result, Defendants were not entitled to suppression of the evidence seized from their car. We therefore REVERSE the district court's grant of Defendants' motion to suppress and REMAND for further proceedings consistent herewith.

---

1. The record reflects the agents questioned Defendants at the primary area for one minute and at the secondary area for seven to ten minutes before the dog alerted. Thus, the total detention time before the dog alerted was eight to eleven minutes.