2000-NMCA-009

995 P.2d 492

**STATE of New Mexico, Plaintiff–Appellee,**

v.

**Candelario CARDENAS–ALVAREZ, Defendant–Appellant.**

**No. 19,466.**

Court of Appeals of New Mexico.

Dec. 10, 1999.

Certiorari Granted, No. 26,138, Jan. 31, 2000.

Patricia A. Madrid, Attorney General, Arthur W. Pepin, Assistant Attorney General, Santa Fe, for Appellee.

Phyllis H. Subin, Chief Public Defender, Bruce Rogoff, Appellate Defender, Santa Fe, for Appellant.

## OPINION

APODACA, Judge.

{1} Defendant was convicted of possession with intent to distribute marijuana. He appeals from the denial of his motion to suppress evidence seized from his motor vehicle by United States Border Patrol agents. He raises four issues, arguing that: (1) although his initial detention at a checkpoint was lawful, it became an unlawful detention because the Border Patrol agents (a) exceeded the scope of permissible routine inquiries or (b) did not have reasonable suspicion to justify prolonging his detention at the checkpoint once they found out he was a lawful resident alien; (2) his consent to the search of the vehicle was tainted by the illegal detention; (3) his consent to the search was not voluntary because he was not told that he could refuse consent; and (4) the warrantless search of the vehicle was improper because the State failed to show exigent circumstances. We hold that, although Defendant's detention was initially lawful, it became an unlawful detention because the federal agents exceeded the scope of permissible inquiries and there was no reasonable suspicion to extend the detention. We also hold that, because the extended detention was unlawful, Defendant's consent was tainted. We therefore reverse the trial court's denial of Defendant's motion to suppress under the first and second issues. Because of our disposition, we need not address Defendant's remaining two issues.

## I. FACTUAL BACKGROUND

{2} In the evening of the day Defendant was arrested, he was driving a Dodge pickup with Mexican license plates. He entered the primary inspection area checkpoint on Highway 185 north of Las Cruces. The Border Patrol agent manning the checkpoint, Agent Arredondo, asked for identification. In response, Defendant produced a valid resident-alien identification card. When asked whether he was traveling from Mexico or El Paso, Defendant replied his trip began in El Paso and that he was traveling to Albuquerque to pick up a broken-down automobile. The registration for the Dodge pickup was not in Defendant's name, and Defendant claimed the vehicle belonged to a friend.

{3} The agent testified at the suppression hearing that he became suspicious because of Defendant's responses to the agent's initial questions. The following formed the basis for Agent Arredondo's suspicions:

{4} Defendant was using Highway 185 to get to Albuquerque rather than driving on I–25. It was unusual for a resident alien to be driving a vehicle with Mexican plates because, if a person lived in the United States, that person would probably register the vehicle in the United States. Before working for the Border Patrol, Agent Arredondo had worked seven years buying vehicles at auction and transporting them. Based on this experience, the agent considered it suspicious that Defendant was traveling to Albuquerque in the evening and without a tow-bar. When the agent had done that kind of work, he had begun his journey in the morning so he could do the whole trip in one day and save hotel and food expenses. Finally, the agent had always taken someone with him when he traveled because it was easier to hook up a tow-bar with assistance.

{5} Based on the above, Agent Arredondo directed Defendant to the secondary inspection area. Defendant drove the short distance between the primary and secondary areas, where Agent Arredondo asked Defendant in Spanish for consent to search the pickup. Defendant consented. (There is a dispute of the parties concerning the Spanish words used by the agent to request consent. Because of our disposition, however, we need not resolve this dispute. Instead, we will assume without deciding that consent was properly obtained.)

{6} After consent was allegedly given, Agent Olivares came to assist Agent Arredondo and began examining the outside of the pickup. He noticed fresh scratch marks

around the gas intake and fuel tank bolts behind the rear wheel well. These observations indicated to him that work on the gas tank had been done recently, and he informed Agent Arredondo of what he saw. Agent Arredondo requested and received consent from Defendant to a canine inspection of the pickup. Defendant also consented to the fifteen-minute delay to get the dog to the checkpoint. When the dog arrived and was directed to the pickup, it alerted the agents to the gas tank. With the aid of a flashlight, the agents looked through the filter hose and saw a second metal tank inside the gas tank. At this point, Defendant was arrested and advised of his rights. The pickup was then towed to the I–25 checkpoint a few miles away, where the gas tank was removed. Eighty-five pounds of marijuana were discovered.

## II. DISCUSSION

### A. Standard of Review

{7} A trial court's denial of a motion to suppress "will not be disturbed on appeal if the ruling is supported by substantial evidence." *State v. Galloway*, 116 N.M. 8, 9, 859 P.2d 476, 477 (Ct.App.1993). Whether the evidence is sufficient to deny a motion to suppress is a question of law and therefore is reviewed de novo. *See State v. Affsprung*, 115 N.M. 546, 547, 854 P.2d 873, 874 (Ct.App. 1993).

### B. Permissibility of an Extended Detention

{8} The issue of Defendant's extended detention is dispositive. We recognize that the Tenth Circuit and our courts differ in the resolution of this issue and appreciate the State's concern that these differences could create confusion for federal agents when confronted with what is and what is not allowed by way of inquiries during a routine checkpoint stop. We therefore examine state and Tenth Circuit cases dealing with this issue and the standards under both by which agents may properly extend a detention in New Mexico.

### 1. New Mexico Cases

{9} Our Court has acknowledged that, at fixed checkpoints, Border Patrol agents may stop motor vehicles to inquire about citizenship and to visually inspect the vehicle without violating a person's constitutional rights. *See Affsprung*, 115 N.M. at 549, 854 P.2d at 876 (stating the constitutionally acceptable boundaries for fixed checkpoints stops). When a person is detained beyond the needed time to ask these routine questions, however, reasonable suspicion must be present. *See State v. Porras–Fuerte*, 119 N.M. 180, 184, 889 P.2d 215, 219 (Ct.App.1994) ("[T]he standard for detention at a border checkpoint beyond initial questioning was reasonable suspicion." (citing *Affsprung*, 115 N.M. at 549, 854 P.2d at 876)).

{10} Our Court has held that movement to a secondary area is considered detention beyond a reasonable inquiry. *See Affsprung*, 115 N.M. at 550, 854 P.2d at 877 (stating that moving the defendant to the secondary area was "an appropriate detention" because the agent had reasonable suspicion). Our courts have made it clear that an officer must have "reasonable suspicion to justify the further detention and investigation in the secondary detention area." *Id.* at 551, 854 P.2d at 878; *see also State v. Bolton*, 111 N.M. 28, 37, 801 P.2d 98, 107 (Ct.App. 1990).

{11} We have also determined what is necessary for reasonable suspicion to exist. *See Galloway*, 116 N.M. at 10, 859 P.2d at 478 ("[R]easonable suspicion is the standard by which to judge detention at a checkpoint [that] extends beyond the time necessary for agents to satisfy themselves about the citizenship of a vehicle's occupants...."). To determine if reasonable suspicion exists, we must examine the totality of the circumstances. *Affsprung*, 115 N.M. at 549, 854 P.2d at 876. Gut instincts are never sufficient to detain a motorist beyond routine questions. *Cohen*, 103 N.M. at 562, 711 P.2d at 7. To detain beyond routine inquiry, an agent "must be aware of ... specific articulable facts, together with rational inferences" to justify reasonable suspicion. *Id.* Slapping together factors that "do

nothing more than highlight the ordinary, rather than the sinister" is insufficient. *State v. Anderson,* 107 N.M. 165, 169, 754 P.2d 542, 546 (Ct.App.1988). "Unsupported intuition is [also] insufficient." *Cohen,* 103 N.M. at 562, 711 P.2d at 7. Only when traffic is heavy may an officer move a vehicle to the secondary area without reasonable suspicion. *Bolton,* 111 N.M. at 38, 801 P.2d at 108.

### 2. Tenth Circuit Cases

{12} The Tenth Circuit has allowed agents, without individualized suspicion, not only to inquire of citizenship and immigration status, but have held that the agents "may briefly question individuals 'concerning such things as vehicle ownership, cargo, destination, and travel plans.'" *United States v. Massie,* 65 F.3d 843, 848 (10th Cir.1995) (quoting *United States v. Rascon–Ortiz,* 994 F.2d 749, 752 (10th Cir.1993)); *see also United States v. Chavira,* 9 F.3d 888, 889 (10th Cir.1993) (holding that an "inquiry into [trip] destination [is] permissible even in the absence of suspicious circumstances"). The stop, however, must be "brief and unintrusive" and any stop "beyond the scope of a routine checkpoint stop must be based upon reasonable suspicion...." *Massie,* 65 F.3d at 848; *see also United States v. Monsisvais,* 907 F.2d 987, 992 (10th Cir.1990) (stating that "not every suspicion that is 'articulable' is reasonable"). The court has also allowed agents to question beyond the routine inquiry if "suspicious circumstances" exist. *Chavira,* 9 F.3d at 889. Federal case law has held that suspicious circumstances do not rise to the level of reasonable suspicion, and, in determining what constitutes suspicious circumstances, a court examines "the totality of the circumstances." *Massie,* 65 F.3d at 848–49.

{13} As for moving a vehicle to a secondary area, the court has given Border Patrol agents " 'virtually unlimited discretion to refer cars to the secondary inspection area.'" *Id.* at 847 (quoting *United States v. Sanders,* 937 F.2d 1495, 1499 (10th Cir.1991)). Where a routine stop is conducted is " 'irrelevant to Fourth Amendment concerns.'" *Id.* (quoting *Rascon–Ortiz,* 994 F.2d at 753); *see also*

*Sanders,* 937 F.2d at 1499–1500 (holding that "directing Defendant to the secondary inspection area to answer additional questions is permissible under the Fourth Amendment"). The court, however, still requires detentions "beyond the scope of a routine checkpoint stop [to] be based upon reasonable suspicion." *Massie,* 65 F.3d at 848. In *Massie,* the routine questioning was complete before removal to the secondary area. Thus, the court held that the issue was not whether movement was proper but whether the extended detention was based on suspicious circumstances. *Id.*

### 3. The Appropriate Standard for Extended Detention

{14} In light of the applicable case law and to address the arguments of the parties on appeal, we examine the standards established by both Tenth Circuit and our state cases for allowing federal agents to extend detentions beyond the routine questions. When permitting extended detentions, the distinguishing characteristic between our state cases and Tenth Circuit cases is "reasonable suspicion" versus "suspicious circumstances." *Compare Galloway,* 116 N.M. at 9, 859 P.2d at 477 (stating reasonable suspicion is needed "to refer the vehicle to the secondary area ..."), *with Chavira,* 9 F.3d at 889 (stating suspicious circumstances to allow continued detention past routine inquiry). Both Tenth Circuit and our cases rely on the "totality of the circumstances" when addressing whether the standard has been met. *See, e.g., Monsisvais,* 907 F.2d at 990 (discussing the need to examine the totality of the circumstances when deciding if suspicious circumstances were present); *Galloway,* 116 N.M. at 9, 859 P.2d at 477 (discussing the need to examine the totality of the circumstances when deciding if reasonable suspicion was present). Although *Massie* stated that the standard for suspicious circumstances is not equivalent to that of reasonable suspicion, we are hard pressed to find the difference. *See Massie,* 65 F.3d at 848 (stating there is a difference between suspicious circumstances and reasonable suspicion but not articulating what the difference is). Suspicious circumstances, as with reasonable suspicion, must be supported by the facts. *Id.;*

*see also Galloway,* 116 N.M. at 9–10, 859 P.2d at 477–78 (stating that the officers' reasonable suspicion was supported by the facts). These facts must present a reasonable inference that the vehicle in question may be involved in criminal activity. *See, e.g., Chavira,* 9 F.3d at 889 (stating that the facts gave reasonable inference to support the officer's belief that suspicious circumstances existed); *Cohen,* 103 N.M. at 561–62, 711 P.2d at 6–7 (stating that facts supported the inference that reasonable suspicion existed). The process of obtaining suspicious circumstances, we thus believe, is very similar to that of reasonable suspicion.

{15} The real distinction between Tenth Circuit and state cases is in the type of questions an agent may ask. We need not address whether questions dealing with "vehicle ownership, cargo, destination, and travel plans" are acceptable without reasonable suspicion in New Mexico because, in this appeal, resolving that issue is not necessary. *Massie,* 65 F.3d at 847–48. We believe that, even if these questions were permissible under state case law, the answers would not have alerted Agent Arredondo to the existence of even suspicious circumstances under the Tenth Circuit standard. Specifically, Defendant's answers would not have indicated involvement in any criminal activity. The same applies to Agent Arredondo's other basis for suspicions, based on his own personal experiences, which we outlined above in the factual background section of this opinion. Nothing in the record suggests that Defendant's responses or behavior were at all suspicious. Consequently, for the reasons that follow, we hold that the federal agents in this case did not meet either of these standards. For purposes of our discussion, however, we will assume without deciding, that the Tenth Circuit standard of suspicious circumstances is a lower standard, as apparently argued by the State.

{16} When determining whether suspicious circumstances or reasonable suspicion exists, a court must examine the specific facts of each case. *See Porras–Fuerte,* 119 N.M. at 185–86, 889 P.2d at 220–21 (examining the facts of the case and determining that they did not add up to reasonable suspicion);

*Monsisvais,* 907 F.2d at 990–91 (examining the facts to determine if they add up to suspicious circumstances). These facts must give an agent " 'a particularized and objective basis for suspecting the particular person stopped of criminal activity.' " *Monsisvais,* 907 F.2d at 990 (emphasis omitted) (quoting *United State v. Cortez,* 449 U.S. 411, 417–18, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981)). In other words, when the facts "do nothing more than highlight the ordinary, rather than the sinister," they do not rise to suspicious circumstances or reasonable suspicion. *Anderson,* 107 N.M. at 169, 754 P.2d at 546.

■ {17} We believe an examination of the facts here shows a "highlighting of the ordinary, not the sinister." Defendant was driving a pickup truck that belonged to a friend. The pickup truck had Mexican plates and was traveling from El Paso to Albuquerque. Defendant was driving on a scenic route in the early evening. He stated that the purpose of the trip was to pick up an automobile in Albuquerque. Defendant had no equipment to tow a car nor did he have anyone with him to assist. None of these facts, alone or together, indicate a sinister motive. We also determine that the answers Defendant gave in response to the agent's inquiries did not raise suspicious circumstances. *See Monsisvais,* 907 F.2d at 990–91 (declaring that similar questions and answers did not rise to suspicious circumstances). Additionally, we note that Defendant was never asked the reason for his use of Highway 185, why he was traveling in the early evening, or whether he was meeting friends in Albuquerque. Agent Arredondo drew his suspicion from his personal knowledge of how he would proceed in similar circumstances. The agent did not give Defendant an opportunity to explain his travel plans, let alone inquire enough to raise suspicious circumstances, before extending the detention.

{18} In *Monsisvais,* the Tenth Circuit addressed facts similar to the facts here and determined that, among other things, "a vehicle's presence on Highway 85 [now 185, the same highway used by Defendant in this appeal] at 7:30 [was not] at all unusual, much less that it [was] suggestive of criminal conduct." *Monsisvais,* 907 F.2d at 990–91; *see*

**576**

*also Sanders,* 937 F.2d at 1501 ("To claim suspicious circumstances based solely on the time of day an individual chooses to travel risks labeling all who travel on what some feel is an unusual hour as suspicious."). In *Monsisvais,* the agent also observed the defendant's truck riding low to the ground, had out-of-state plates, and was driven northbound on Highway 85 (now 185). *Monsisvais,* 907 F.2d at 988–89. The court found the totality of these facts did not rise to suspicious circumstances. *Id.* at 990–91. In summary, based on our review of the federal case law, we fail to see how the facts known to the Border Patrol agents in this appeal met what we have assumed to be the lower Tenth Circuit standard of suspicious circumstances.

{19} Additionally, upon arrival at the secondary area, Agent Arredondo did not continue routine questioning, but immediately asked for consent to search the truck. Apparently, the agent's routine questions were completed at the primary area. We determine that Defendant's responses to those questions did not rise to the level of reasonable suspicion or suspicious circumstances. As a result, the movement to the secondary area was part of an illegal detention.

{20} The State argues that the transfer to the secondary area was not, in and of itself, an extended detention. The State notes that federal law allows such transfers. *See Sanders,* 937 F.2d at 1500 (stating that movement to a secondary area is "permissible under the Fourth Amendment"). On this basis, the State argues, the inspection of the pickup by Agent Olivares would meet the state standard of reasonable suspicion. We need not reach that argument, however, since, as we have noted, the routine questioning was complete at the primary area. We also note that New Mexico law regards movement to a secondary area as an extended detention requiring reasonable suspicion absent traffic congestion. *See Bolton,* 111 N.M. at 37–38, 801 P.2d at 107–08 (stating that reasonable suspicion is necessary for removal to a secondary area absent traffic congestion). Here, there is nothing in the record showing the need to move Defendant to the secondary area because of traffic. For

this reason, the move itself was part of an illegal detention. *Id.* at 37, 801 P.2d at 107. "The threat to fourth amendment interests" occurs when "excessive detentions [are] not founded on reasonable suspicion or probable cause." *Id.* at 34, 801 P.2d at 104.

{21} We conclude that Defendant's removal from the primary area to the secondary area was an unlawful extension of his detention because the federal agent met neither the Tenth Circuit nor New Mexico case law requirements of suspicious circumstances or reasonable suspicion respectively. We stress that in reversing the trial court's order denying Defendant's motion to suppress, we have not considered it necessary to take issue with the preliminary inquiries permitted at border checkpoints under federal case law. What we have taken issue with, instead, is the State's argument that Defendant's responses and the facts known by the agent in this appeal gave rise to either the suspicious circumstances or reasonable suspicion necessary to justify an extension of the detention. The State does not contend nor does the factual record support that Defendant exhibited any unusual or irregular behavior when stopped.

{22} It is difficult to understand why the dissent maintains that we are not following federal law in deciding this appeal. We believe our discussion on the issue makes it clear that we are not ignoring federal case law. What we have done is to point out the various differences between the Tenth Circuit and our cases concerning terminology and the extent of the preliminary inquiries permitted at border checkpoints. The parties have argued these differences in their briefs. Without deciding which standard is stricter and without choosing one over the other, we have based our disposition solely on the premise that the actions of the agent in this appeal met neither standard.

{23} We also disagree with the dissent that, under the facts of this appeal, referral to the secondary area was permissible under federal case law. We previously noted, for example, that in *Massie,* 65 F.3d at 848, the routine questioning was complete before removal to the secondary area. The federal court thus held that the issue was not

whether movement was proper but whether the extended detention was based on suspicious circumstances. *Id.* We therefore believe that, even under federal law, once the agent in this appeal exhausted the permissible initial inquiries, any extension of the detention, without suspicious circumstances, whether at the primary or secondary area, was prohibited.

{24} Neither does our holding run counter to our Supreme Court's decision in *State v. Gomez*, 1997–NMSC–006, 122 N.M. 777, 932 P.2d 1, as suggested by the dissent. The dissent misconstrues the basis of our holding and incorrectly suggests that our analysis of the facts in this appeal is contrary to *Gomez.* Our holding is not premised on the application of a stricter standard under our own state constitutional provisions but instead is based on our application of both federal and our own case law under the Fourth Amendment of the United States Constitution.

### C. Defendant's Consent to Search

{25} Evidence obtained must be suppressed if it is the fruit of an illegal detention. *Hayes v. Florida*, 470 U.S. 811, 813–14, 105 S.Ct. 1643, 84 L.Ed.2d 705 (1985). Voluntary consent may cleanse the taint of an illegal detention if there is a sufficient break between the illegal detention and the consent to search. *See State v. Bedolla*, 111 N.M. 448, 454–55, 806 P.2d 588, 593–94 (Ct.App.1991) (citing the test set forth in *Brown v. Illinois*, 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975)). The State cites *Bolton* to support its claim that the consent was valid. We believe this reliance is misplaced. As we previously observed, *Bolton* held that movement to a secondary area requires "reasonable suspicion." *Bolton*, 111 N.M. at 37, 801 P.2d at 107. Since we have determined that reasonable suspicion did not exist, the movement to the secondary area was an illegal detention. Thus, *Bolton*'s discussion regarding consent is inapplicable. *See id.* at 42, 801 P.2d at 112 (stating that the consent was valid because it was sought moments after a "lawful detention"). We hold that, for *Bolton* to apply, the consent must follow a lawful, not an unlawful detention. *Id.* Because there was no break between the illegal detention and Defendant's consent to search, we hold that the consent, even if voluntary (which we need not and do not decide) was invalid.

### III. CONCLUSION

{26} We hold that Defendant's extended detention beyond the routine questions asked of Defendant was unlawful. We conclude that Defendant's consent was invalid because the illegal detention was not sufficiently attenuated from the consent to purge the taint. We therefore hold that the trial court erred in denying Defendant's motion to suppress. Defendant's conviction is therefore reversed and this case is remanded for a new trial and for proceedings consistent with this opinion.

{27} **IT IS SO ORDERED.**

ARMIJO, J., concurs.

SUTIN, J., dissenting.

SUTIN, Judge (dissenting).

{28} This is another in a series of United States Border Patrol fixed checkpoint detention and search cases in which we face the difficult task of balancing border-related federal law enforcement against the right to be free from unreasonable searches and seizures under the Fourth Amendment to the United States Constitution.

{29} A permanent Border Patrol checkpoint is an inland traffic-checking operation established for the purpose of minimizing illegal immigration. *See United States v. Martinez–Fuerte*, 428 U.S. 543, 552, 96 S.Ct. 3074, 49 L.Ed.2d 1116 (1976). "[T]he need to make routine checkpoint stops is great, [and] the consequent intrusion on Fourth Amendment interests is quite limited." *Id.* at 557, 96 S.Ct. 3074. Yet, particularly in this state, we must be ever mindful of the very important concern raised by Justice Brennan in his dissent in *Martinez–Fuerte*, 428 U.S. at 572–73, 96 S.Ct. 3074:

Every American citizen of Mexican ancestry and every Mexican alien lawfully in this country must know after today's decision that he travels the fixed checkpoint highways at the risk of being subjected not only to a stop, but also to detention and

interrogation, both prolonged and to an extent far more than for non-Mexican appearing motorists. To be singled out for referral and to be detained and interrogated must be upsetting to any motorist. One wonders what actual experience supports my Brethren's conclusion that referrals "should not be frightening or offensive because of their public and relatively routine nature." *Ante*, at 3084. In point of fact, referrals, viewed in context, are not relatively routine; thousands are otherwise permitted to pass. But for the arbitrarily selected motorists who must suffer the delay and humiliation of detention and interrogation, the experience can obviously be upsetting. And that experience is particularly vexing for the motorist of Mexican ancestry who is selectively referred, knowing that the officers' target is the Mexican alien. That deep resentment will be stirred by a sense of unfair discrimination is not difficult to foresee.

(Footnotes omitted.)

{30} Our role is to keep Justice Brennan's concern very much in mind, to reprove present police abuse, and to curtail future police abuse, while deciding these difficult issues in a way that does not unreasonably restrict law enforcement officers from carrying out the proper government policies pursuant to which Border Patrol fixed checkpoint sites are established. The decision whether a particular Border Patrol detention is lawful is often a close one. Border Patrol cases tried in state court are unique in that we are judging the conduct of federal officers who are acting under federal policy and who believe that their conduct is governed by federal cases interpreting the Fourth Amendment. In these cases, we should " 'recognize the responsibility of state courts to preserve national uniformity in development and application of fundamental rights guaranteed by our state and federal constitutions.' " *State v. Gomez*, 1997–NMSC–006, ¶ 21, 122 N.M. 777, 932 P.2d 1. "[W]e should avoid creating confusion and be particularly deferential to opinions of the ... Tenth Circuit." *State v. Fierro*, 121 N.M. 398, 399, 911 P.2d 1202, 1203 (Ct.App.1996) (Hartz, J., specially concurring).

{31} Federal constitutional law is to be applied in our Border Patrol search and seizure cases unless the particular right that is asserted is not protected under the United States Constitution, the discrete issue is preserved for decision under Article II, Section 10 of the New Mexico Constitution, and we determine that the federal law is flawed or that some distinctive State characteristic requires a departure from federal law. *See Gomez*, 1997–NMSC–006, ¶¶ 18–22, 122 N.M. 777, 932 P.2d 1. In Border Patrol cases, only one such issue has been decided under Article II, Section 10 thus far. In *State v. Snyder*, 1998–NMCA–166, ¶ 18, 126 N.M. 168, 967 P.2d 843, we rejected the federal interpretation of the Fourth Amendment in favor of a rule that precludes a warrantless search of a lawfully-stopped vehicle and any closed containers within that vehicle when the agent has probable cause, *unless* exigent circumstances exist justifying a warrantless search.

{32} In the context of whether suspicious circumstances rather than reasonable suspicion is required to detain a motorist after an initial investigation is completed, the majority has determined that our State cases apply the Fourth Amendment differently than the Tenth Circuit Court of Appeals applies the Fourth Amendment. The majority also says that "New Mexico law regards movement to a secondary area as an extended detention requiring reasonable suspicion absent traffic congestion," holds that "the move [of Defendant] itself [to secondary] was part of an illegal detention," and reasons that " '[t]he threat to fourth amendment interests' occurs when 'excessive detentions [are] not founded on reasonable suspicion or probable cause.' " Border Patrol law in New Mexico is puzzling. We purport to interpret the Fourth Amendment, but we depart from Tenth Circuit case law. In doing so, we apply a different—state—standard. This departure is impermissible without the preservation requirements of *Gomez* having been satisfied and the *Gomez* interstitial analysis having been made. 1997–NMSC–006, ¶¶ 19–23, 122 N.M. 777, 932 P.2d 1. *See also, State v. Coffin*, 1999–NMSC–038, n. 2, 128 N.M. 192, 991 P.2d 477.

{33} This case is simply one in which Defendant's consent to search was within the scope of lawful detention under federal law. The time in secondary was brief with minimal intrusion. Consent to search was immediately requested and given, and the right to continue with routine investigation had not expired. The majority actually interprets federal case law for its holding in the present case. In my view, the majority interprets the federal law too broadly. I do not believe that the federal cases provide as much protection to motorists as the majority believes they do.

{34} Neither the scope nor the propriety of the agent's questions *at primary* is at issue in this case. Even were it at issue, federal law is clear that the questioning at primary in this case was proper. Border Patrol agents at fixed checkpoints are not required to "confine their activities to immigration-related matters." *United States v. Gonzalez–Acosta*, 989 F.2d 384, 388 (10th Cir.1993). They may also look into possession of illegal drugs, vehicle ownership and registration, proof of insurance and driver's license, and are permitted to inquire about point of origin and destination, cargo, and travel plans. *See United States v. Chavira*, 9 F.3d 888, 889 (10th Cir.1993) ("[T]he permissible scope of a routine border checkpoint stop extends beyond a mere inquiry into citizenship.... [A] few brief questions concerning such things as vehicle ownership, cargo, destination and travel plans may be appropriate if reasonably related to the agent's duty to prevent ... the smuggling of contraband."); *United States v. Rascon–Ortiz*, 994 F.2d 749, 752 (10th Cir.1993) (Border Patrol agents may request documentation from motorists and may briefly question motorists about "vehicle ownership, cargo, destination, ... travel plans," and citizenship and immigration status); *United States v. Ludlow*, 992 F.2d 260, 264 (10th Cir.1993) (A Border Patrol agent's routine inquiry may include questions concerning citizenship, customs matters, and suspicious circumstances or behaviors). *Cf. United States v. Diaz–Albertini*, 772 F.2d 654 (10th Cir.1985) (State Police at roadblock may inspect driver's licenses, insurance, and registration papers); *State v. Reynolds*, 119 N.M. 383, 384, 890 P.2d 1315, 1316 (1995) ("[W]hen a vehicle is lawfully stopped ... an officer may reasonably detain the vehicle and its passengers for the purpose of asking for identification, registration, and/or proof of insurance."); *State v. Valencia Olaya*, 105 N.M. 690, 692, 736 P.2d 495, 497 (Ct.App.1987) (New Mexico recognizes the validity of routine-roadblock stops to check driver's licenses, registrations, and proof of insurance). Presumably, Border Patrol agents also have the right to conduct wants and warrants checks. *Cf. State v. Taylor*, 1999–NMCA–022, ¶ 14, 126 N.M. 569, 973 P.2d 246 (detention following initial investigatory stop by an officer to permit the officer to conduct wants and warrants check lawful as simply a continuation of ongoing investigation). Because the agent's questions in primary did not stray from permissible areas, Defendant's detention at primary was lawful at the point when the agent asked Defendant to go to the secondary inspection area.

{35} The referral of Defendant from primary to secondary was also lawful under federal law. According to *Ludlow*, 992 F.2d at 263–64 (citations and footnote omitted):

[N]o individualized suspicion is necessary to stop, question, and then selectively refer motorists to a secondary inspection checkpoint....

... Border Patrol agents have virtually unlimited discretion to selectively refer cars to the secondary inspection area. Thus, a routine checkpoint inquiry may properly take place at a primary inspection area, a secondary inspection area, or both as long as the scope of the inquiry is appropriate.

*Accord Massie*, 65 F.3d at 847; *Sanders*, 937 F.2d at 1499 ("No individualized suspicion is necessary to stop, question and then selectively refer motorists to a secondary inspection checkpoint. Border patrol agents have virtually unlimited discretion to refer cars to the secondary inspection area."). (Citations and quotation omitted.)

{36} Furthermore, no prohibition exists against an agent asking a driver for consent to search before or during the agent's routine investigation, and even a momentary

extension of the lawful detention for the purpose of requesting permission to search does not require reasonable suspicion.

> Consent searches are part of the standard investigatory technique of law enforcement agencies. They normally occur on the highway.... The circumstances that prompt the initial request to search may develop quickly or be a logical extension of investigative police questioning. The police may seek to investigate further suspicious circumstances....

*Schneckloth v. Bustamonte,* 412 U.S. 218, 232, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973). Law enforcement officers may ask for consent at any time during the lawful stop or immediately following the completion of routine investigation. *See Ohio v. Robinette,* 519 U.S. 33, 35–36, 117 S.Ct. 417, 136 L.Ed.2d 347 (1996) (consent lawful when obtained following these occurrences: negative computer check for previous violations; the issuance of a verbal warning after being asked to step out of the car and while defendant was being videoed; the return of defendant's license; the questions: "[A]re you carrying any illegal contraband in your car? Any weapons of any kind, drugs, anything like that?" and defendant's negative answer); *Diaz–Albertini,* 772 F.2d at 659 ("After the negative NCIC response it was permissible for the officer to ask to search"); *State v. Pallor,* 1996–NMCA–083, ¶ 16, 122 N.M. 232, 923 P.2d 599 ("Because there was a valid basis for the stop, it was permissible for the officers to ask permission to search the vehicle."); *Bolton,* 111 N.M. at 42–43, 801 P.2d at 112–13 (explaining that the officer's request for consent to search at secondary did not violate the Fourth Amendment because the request did not unduly prolong the detention); *Valencia Olaya,* 105 N.M. at 691, 696, 736 P.2d at 496, 501 (consent to search not tainted following detention during which officer requested and received license and registration, directed defendant to pull his car to the right shoulder based on a deodorizer smell and title irregularity, ran an NCIC check on defendant and vehicle that produced a negative response, asked defendant where he was traveling from and where he was going, and then asked for consent to search.).

{37} In this case, Defendant consented to the search as soon as he landed in secondary. The federal cases require that agents act diligently so that each detention is brief and therefore not intrusive. *See Rascon–Ortiz,* 994 F.2d at 752 ("A routine checkpoint stop must be brief and unintrusive."); *cf. Diaz–Albertini,* 772 F.2d at 659 ("The interval between the initial taking of the ... driver's license and the request to search was so short that it cannot be said the kind of implied duress recently condemned in Recalde took place."). The record in this case does not disclose the period of time that elapsed from the point at which the agent directed Defendant to secondary and the agent's request to search. It appears that the time was minimal. Certainly, if the time was more than a minute or two, Defendant would have raised the time element as evidence that the detention was impermissibly intrusive. Because Defendant does not raise this argument, I assume that the detention was not so long as to be even arguably unreasonable.

{38} The agent in this case had not exceeded the scope of permissible investigation before sending Defendant to secondary. The agent had reason to continue investigation regarding the vehicle's status since Defendant claimed it belonged to a friend, the vehicle had Mexican license plates, and the agent had not yet seen the vehicle's registration or Defendant's driver's license. Surely the agent had lawful authority, if not good reason, to investigate further into these circumstances. *Cf. United States v. Sukiz–Grado,* 22 F.3d 1006, 1009 (10th Cir.1994) (referral to secondary for a dog sniff held lawful following agent's having noticed a temporary license tag, the driver having said that the car belonged to a friend, the agent having noticed the driver's nervousness, and after the driver gave permission at primary to a dog sniff of the exterior of the car); *United States v. Lopez,* 777 F.2d 543, 548 (10th Cir.1985) (holding detention lawful when police referred driver to secondary to check ownership of the vehicle after the driver admitted that the car did not belong to him and the registration revealed that the car was owned by another); *Diaz–Albertini,* 772

F.2d at 655 (lawful to order driver to move car from roadblock on to highway's median in order to conduct NCIC check after officer learned that driver had Florida driver's license, the car's license and plates were from California, and driver was not registered owner). Because the agent had the right to continue investigating when Defendant was referred to secondary, and because an agent has broad discretion to make such a referral, I believe the referral was lawful. The referral to secondary did not exceed the boundaries of permissible detention for continuing investigation, and did not become a de facto arrest. *Cf. State v. Flores,* 122 N.M. 84, 89, 920 P.2d 1038, 1043 (Ct.App.1996) ("When a detention exceeds the boundaries of a permissible investigatory stop, it becomes a de facto arrest requiring probable cause.").

{39} Whether the agent subjectively intended to continue his routine investigation or only to immediately ask for consent in secondary is not material to the outcome of this case. "[T]he Fourth Amendment's concern with 'reasonableness' allows certain actions to be taken in certain circumstances, *whatever* the [officer's] subjective intent." *Whren v. United States,* 517 U.S. 806, 814, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996) (holding that the constitutional reasonableness of a traffic stop did not depend on the actual motivation of the officer involved as long as the officer articulated a lawful reason for the stop) (emphasis added). In the present case the agent had authority to investigate further and the fact that his first inquiry immediately upon Defendant's arrival in secondary was a request for consent does not change a brief and lawful detention into an intrusive, unlawful one. *Cf. Porras–Fuerte,* 119 N.M. at 186, 889 P.2d at 221 (explaining that the agent's subjective reason for stopping a vehicle does not have to be the right reason, "as long as the facts known to the officer and articulated by him provide [the right] reasons").

{40} Whether Defendant's detention was illegal under the Fourth Amendment is measured by the reasonableness of the detention. *See United States v. Espinosa,* 782 F.2d 888, 890 (10th Cir.1986) (the Fourth Amendment only protects against unreasonable searches and seizures). "The preeminent inquiry [un-der the Fourth Amendment] is whether the search and seizure was reasonable." *State v. Flores,* 122 N.M. 84, 87, 920 P.2d 1038, 1041 (Ct.App.1996). Under the federal case law, this detention was reasonable and lawful. I, therefore, respectfully dissent.

{41} In summary, the detention of Defendant was brief and unintrusive. It was also reasonable. The Fourth Amendment allows a Border Patrol agent to refer a motorist to secondary to conduct or continue routine investigation, and the agent had authority and reason in this case to refer Defendant to secondary. The United States Constitution does not forbid asking for and obtaining consent to search during routine investigation at primary or secondary, or even asking for consent within a moment following the investigation. Even were the *Gomez*-interstitial approach required and followed here, I see no reason to abandon federal law and adopt a new rule under our State Constitution in order to turn this legal United States Border Patrol detention into an illegal one. Finally, the reasonableness of "police activity ... is almost invariably a factbound inquiry." *United States v. Rodriguez–Morales,* 929 F.2d 780, 783 (1st Cir. 1991). The court below sees and hears the witnesses and is closer to the real circumstances than an appellate court, which is relegated to the "virtual reality" of the record. "Hence, appellate oversight is correspondingly deferential," *id.,* when reviewing the district court's fact findings following a suppression hearing. Furthermore, I do not conclude that the district court's denial of Defendant's motion to suppress was a misapplication of the law to the facts. *See State v. Shaulis–Powell,* 1999–NMCA–090, ¶ 7, 127 N.M. 667, 986 P.2d 463 (appellate court considers whether the trial court properly applied the law to the facts). I would affirm the trial court's denial of Defendant's motion to suppress.