UNITED STATES of America,
Plaintiff–Appellant,

v.

Juan Manuel RASCON–ORTIZ,
and Edgar Rascon–Sotelo,
Defendants–Appellees.

Nos. 91–2291 and 91–2292.

United States Court of Appeals,
Tenth Circuit.

May 28, 1993.

**750**

Kelly H. Burnham (Don J. Svet, U.S. Atty., Albuquerque, NM, with her on the brief), Asst. U.S. Atty., Las Cruces, NM, for plaintiff-appellant.

Francisco Mario Ortiz, Las Cruces, NM, for defendant-appellee in No. 91–2291.

William D. Fry, Asst. Federal Public Defender, Las Cruces, NM, for defendant-appellee in No. 91–2292.

Before MOORE, BRORBY and EBEL, Circuit Judges.

BRORBY, Circuit Judge.

At a permanent border patrol checkpoint located near the United States–Mexico border, agents discovered thirty-eight pounds of marijuana hidden in the fuel tank of a vehicle driven by the Appellees, Juan Manual Rascon–Ortiz and Edgar Rascon–Sotelo. Both men were indicted for possession with intent to distribute marijuana in violation of 21 U.S.C. § 841(a)(1), (b)(1)(D) and 18 U.S.C. § 2. The United States appeals the district court order granting the Appellees' motion to suppress evidence obtained at the checkpoint. We reverse.

## I. Background

The relevant facts are as follows. On October 13, 1991, Juan Manual Rascon–Ortiz drove his Mercury Topaz into the permanent border patrol checkpoint located on Highway 54, near Orogrande, New Mexico, roughly forty miles from the Mexico border. Mr. Rascon–Ortiz, accompanied by Mr. Edgar Rascon–Sotelo, stopped as required at the primary inspection area. Border patrol agent Sidney Hooper questioned Mr. Rascon–Ortiz about his citizenship. According to Agent Hooper's observations, Mr. Rascon–Ortiz's hand was shaking badly when he handed Agent Hooper his alien registration card. Agent Hooper then inquired as to Mr. Rascon–Sotelo's citizenship and Mr. Rascon–Sotelo replied that he was a Mexican citizen and produced a Mexican passport with a visitor's visa. Mr. Rascon–Sotelo's hand was also visibly shaking. Due to their nervous behavior, Agent Hooper, who had over eighteen years experience as a border patrol agent, directed the Appellees to secondary inspection while he checked other vehicles which had stopped behind the Appellees. Appellees were at the primary inspection area for one to two minutes.

Border Patrol Agent Eligio Pena, who was not present during the primary inspection, talked briefly with Agent Hooper before going to the secondary inspection area. Agent Hooper told Agent Pena that he thought they "had something because [the Appellees] were shaking like leaves in the wind." Agent Pena became more suspicious when he noticed the car was a Mercury Topaz because four similar vehicles manufactured by Ford were found to have contraband hidden in false compartments in their gas tanks during the past six weeks. Without further questioning the Appellees, Agent Pena knelt down and looked under the car with a flashlight and noticed the bolts supporting the gas tank were shiny, indicating someone may have tampered with them. Agent Pena then got on his back and slid under the car to take a closer look. With the aid of a mirror and flashlight, Agent Pena observed that both the

bolts supporting the gas tank and the threads of the gas line clamp were shiny and scratched, as if they had recently been removed or replaced. Agent Pena's brief inspection of the vehicle's undercarriage at secondary took roughly two minutes.

Based upon his observations under the car and his seven years of experience as a border patrol agent, Agent Pena determined that the gas tank had recently been removed and might contain a false compartment. Agent Pena then brought out a trained dog which alerted on the gas tank, indicating the presence of contraband.[1] The Appellees were advised of their *Miranda* rights and consented, in writing, to a search of the vehicle. The vehicle was subsequently placed on a ramp and a total of thirty-nine pounds of marijuana were discovered in hidden compartments within the gas tank.

Mr. Rascon–Ortiz and Mr. Rascon–Sotelo were indicted for possession with intent to distribute less than fifty kilograms of marijuana in violation of 21 U.S.C. § 841(a)(1), (b)(1)(D) and 18 U.S.C. § 2. Both Appellees moved to suppress all evidence seized at the border checkpoint, alleging the detention and search were unlawful under the Fourth Amendment. After a pretrial hearing, the district court granted the motion to suppress. Although it was deemed reasonable to refer the Appellees to the secondary inspection area, the district court found the border patrol agents lacked the necessary reasonable suspicion or probable cause to justify the "more intrusive investigative detention in the secondary area," and, therefore, the agents "exceeded the bounds of what the Fourth Amendment allowed at that moment." The United States appeals, asserting that the district court erred in granting the Appellees' motion to suppress.

## II. Legal Analysis

Upon appeal, we consider evidence addressed at a suppression hearing in a light most favorable to the prevailing party. *United States v. Johnson*, 895 F.2d 693, 697–98 (10th Cir.1990). While a trial court's finding of facts are reviewed for clear error, *United States v. Palomino*, 877 F.2d 835, 837 (10th Cir.1989), questions of law, including a reasonableness determination under the Fourth Amendment, are reviewed *de novo*, *United States v. Corral*, 970 F.2d 719, 723 (10th Cir.1992).

The government alleges that Agent Pena's visual inspection of the vehicle's undercarriage was part of a valid customs inspection and did not constitute a search. Moreover, the government alleges the Appellees' nervous behavior gave rise to a reasonable suspicion that the Appellees were involved in criminal activity. The Appellees contend Agent Hooper violated their Fourth Amendment rights when he directed them to the secondary inspection area. Specifically, the Appellees assert that because they were questioned about their citizenship and immigration status at the primary inspection area, any further detention was invalid as Agent Hooper lacked probable cause or reasonable suspicion. In order to resolve these allegations, we must first clarify the law concerning primary and secondary inspection areas.[2]

### A. Detention of Appellees at the Secondary Inspection Area.

■ Despite numerous recent rulings, there apparently still exists some confusion over the distinction between primary and secondary inspection areas at border checkpoints. *See, e.g., United States v. Ludlow*, 992 F.2d 260, 263 (10th Cir.1993). In the present case, the confusion appears to stem from two separate statements of the law. First, the Tenth Circuit has repeatedly stat-

---

1. Agent Pena testified that the Appellees consented to the canine inspection, but the district court did not make a factual finding as to this matter. No contradictory evidence was presented as neither Appellee testified at the suppression hearing.

2. While the government did not expressly appeal the issue of whether it was proper for border patrol agents to order Appellees to secondary,

and the Appellees did not cross-appeal, we will address the issue because it is closely intertwined with the issue raised by the government. As a practical matter, it would be difficult, if not impossible, to address only that conduct by the agents which the government alleges was part of a lawful detention, without addressing other agent conduct during the detention.

ed that agents have virtually unlimited discretion in selectively referring motorists to secondary inspection. *See, e.g., United States v. Sanders,* 937 F.2d 1495, 1499 (10th Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 1213, 117 L.Ed.2d 451 (1992); *United States v. Rubio–Rivera,* 917 F.2d 1271, 1275 (10th Cir.1990). This statement of the law is based upon the Supreme Court decision in *United States v. Martinez–Fuerte,* 428 U.S. 543, 96 S.Ct. 3074, 49 L.Ed.2d 1116 (1976). However, as Appellees point out, this circuit has also stated that "when the questions asked at the primary checkpoint allay all concerns about citizenship and immigration status, an agent still may direct a vehicle to a secondary checkpoint and further question the occupants *on the basis of reasonable suspicion that a crime has been committed.*" [3] *Rubio–Rivera,* 917 F.2d at 1276 (emphasis added) (citing *Johnson,* 895 F.2d at 696, 698). These statements of the law are not in conflict.

 A brief summary of relevant border checkpoint law is necessary in order to clarify Tenth Circuit law. A detention at a border checkpoint is a seizure under the Fourth Amendment.[4] *Martinez–Fuerte,* 428 U.S. at 556, 96 S.Ct. at 3082. However, because the public has a substantial interest in protecting the integrity of our national borders, and the intrusion upon one's right to privacy and personal security by a routine border inspection is minimal, a border patrol agent may briefly detain and question an individual without any individualized suspicion as required under *Terry v. Ohio. Martinez–*

*Fuerte,* 428 U.S. at 556–62, 96 S.Ct. at 3082–85. The Fourth Amendment protects an individual's liberty at a border checkpoint by limiting the scope of the detention. *Id.* at 566–67, 96 S.Ct. at 3087.

There are two statements of law in *Martinez–Fuerte* which are especially relevant to our discussion. First, the Supreme Court held that border patrol agents may direct motorists from the primary inspection area to secondary without individualized suspicion and "have wide discretion in selecting the motorists to be diverted." [5] *Id.* at 563–64, 96 S.Ct. at 3085. Second, the Supreme Court held that border patrol agents were allowed to conduct a "routine checkpoint stop," but " '[a]ny further detention ... must be based on consent or probable cause.' " *Id.* at 567, 96 S.Ct. at 3087 (quoting *United States v. Brignoni–Ponce,* 422 U.S. 873, 882, 95 S.Ct. 2574, 2581, 45 L.Ed.2d 607 (1975)).

 A routine checkpoint stop must be brief and unintrusive. It generally involves questions concerning the motorist's citizenship or immigration status, and a request for documentation. *Martinez–Fuerte,* 428 U.S. at 558, 96 S.Ct. at 3083; *United States v. Benitez,* 899 F.2d 995, 997 (10th Cir.1990). A cursory visual inspection of the vehicle is also routine, *Martinez–Fuerte,* 428 U.S. at 558, 96 S.Ct. at 3083, and a few brief questions concerning such things as vehicle ownership, cargo, destination, and travel plans may be appropriate if reasonably related to the agent's duty to prevent the unauthorized entry of individuals into this country and to prevent the smuggling of contraband. The

---

**3.** The "reasonable suspicion" standard is an objective test which requires police to have an articulable, individualized, reasonable suspicion that an individual is involved in some criminal activity in order to conduct a valid, investigatory stop of that individual. *See United States v. Espinosa,* 782 F.2d 888, 890 (10th Cir.1986) (citing *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968)).

**4.** We note this case involves a permanent checkpoint *removed* from the United States–Mexico border, as authorized by 8 U.S.C. § 1357(a)(1) and (a)(3) (1988); *see* 8 C.F.R. § 287.1(a)(2) (1992), and, therefore, all references in this opinion to checkpoints refer to checkpoints *not* located on the border. This is an important distinction as a citizen's Fourth Amendment rights at a

checkpoint located on the border, or its functional equivalent, are significantly less than inside the border. *See United States v. Montoya de Hernandez,* 473 U.S. 531, 538, 105 S.Ct. 3304, 3309, 87 L.Ed.2d 381 (1985); *Almeida–Sanchez v. United States,* 413 U.S. 266, 272–73, 93 S.Ct. 2535, 2539, 37 L.Ed.2d 596 (1973); 19 U.S.C. § 482 (1988).

**5.** The primary inspection area in *Martinez–Fuerte* involved a visual inspection of cars as they slowed and funneled through the checkpoint. A point agent visually screened the traffic and occasionally referred a vehicle to secondary for questioning, leaving the great majority of vehicles to pass through the checkpoint without questioning or close visual inspection. *Id.* 428 U.S. at 545–47, 96 S.Ct. at 3077–78.

Tenth Circuit has further held if an agent observes "suspicious circumstances," the agent may briefly question the motorist concerning those suspicions and ask the motorist to explain. *Sanders*, 937 F.2d at 1500. "The Fourth Amendment does not require police officers to close their eyes to suspicious circumstances," *Johnson*, 895 F.2d at 696 (quoting *Espinosa*, 782 F.2d at 891). While there is no single definition of what constitutes a "suspicious circumstance," border patrol agents are given deference in relying upon their law enforcement training and past experience in deciding whether a suspicious circumstance exists. *Sanders*, 937 F.2d at 1500.[6]

■■■ Tenth Circuit law is consistent with *Martinez–Fuerte*. Border Patrol Agents may inspect vehicles at border checkpoints without individualized suspicion and have "virtually unlimited discretion to refer cars to the secondary inspection area" in order to effectuate the inspection. *Sanders*, 937 F.2d at 1499 (quoting *INS v. Delgado*, 466 U.S. 210, 224 n. 6, 104 S.Ct. 1758, 1767, n. 6, 80 L.Ed.2d 247 (1984) (Powell, J., concurring)). However, the agent's discretion is limited in one important respect—the overall detention cannot exceed a routine checkpoint stop if probable cause, consent or reasonable suspicion does not exist. *Johnson*, 895 F.2d at 696; *Sanders*, 937 F.2d at 1499.[7] Such a limit is necessitated by the Fourth Amendment and the Supreme Court's reasoning in *Martinez–Fuerte*. The key principal of the Fourth Amendment is reasonableness, and the Supreme Court essentially found routine checkpoint stops reasonable.

■■■ Thus, any distinction between primary and secondary inspection is meaningless. Border Patrol Agents must limit their inspection to a routine checkpoint stop unless consent, probable cause or reasonable suspicion arises during the stop. Whether the routine checkpoint stop is conducted at primary, secondary, or both is irrelevant to Fourth Amendment concerns.[8] *Ludlow*, 992 F.2d at 263. Cases cited by the Appellees are not contradictory, but instead stand for the proposition that "reasonable suspicion" is required to prolong a detention beyond the scope of a routine checkpoint stop. *See, e.g., Rubio–Rivera*, 917 F.2d at 1276.

■■■ In the present case, the Appellees' Fourth Amendment rights were not violated when Agent Hooper directed them to the secondary inspection area. Agent Hooper asked a few preliminary questions at the primary inspection area, and became suspicious upon observing that both Appellees' hands were shaking nervously. The district court concluded the Appellees' nervousness constituted suspicious circumstances. We agree and find "the suspicious circumstances ... perceived by the border patrol agent are supported by the facts." *Sanders*, 937 F.2d at 1500. Once the suspicious circumstances arose, Agent Hooper was entitled to further detain the Appellees in order to briefly investigate his suspicions. The fact that the Appellees were directed to the secondary inspection area is immaterial. Since Agent Hooper's actions were within the limits of a routine checkpoint stop, there was no Fourth Amendment violation.

---

6. A "suspicious circumstance" is not equivalent to the "reasonable suspicion" standard. *See Sanders*, 937 F.2d at 1500. The presence of a suspicious circumstance allows a border patrol agent to ask a few additional questions concerning the suspicion during the course of a routine customs inspection. Since the additional questions do not add significantly to the length or intrusiveness of the detention, the more rigid Fourth Amendment requirements of probable cause or reasonable suspicion are not required.

7. We note that a routine customs inspection is, in essence, an investigatory stop and therefore, merely satisfying the "reasonable suspicion" standard may only permit agents to conduct a slightly more intrusive stop than is already permitted. *See Martinez–Fuerte*, 428 U.S. at 567, 96 S.Ct. at 3087 ("[O]ur holding today is limited to the type of stops described in this opinion. '[A]ny further detention ... must be based on *consent or probable cause.*'" (Emphasis added.)).

8. Obviously, if a secondary inspection area is such that it causes the detention to exceed a routine checkpoint stop because it is overly intrusive or lengthy, the secondary inspection becomes relevant in a Fourth Amendment analysis; however, the relevancy would still be based upon the reasonableness of the detention as determined by balancing Fourth Amendment interests, and not merely because the detention occurred at secondary.

*B. Visual Inspection of Car's Undercarriage.*

The remaining issue is whether Agent Pena violated the Appellees' Fourth Amendment rights by examining the undercarriage of the car. The district court interpreted *Sanders* as limiting a border patrol agent to only questioning a motorist at secondary concerning suspicious circumstances and, therefore, concluded that Agent Pena "leapfrogged the next step in the constitutionally permissible continuum" when he immediately proceeded to search the vehicle rather than question the Appellees. We reverse.

The *Sanders* opinion focused exclusively on the scope of questioning permissible during a checkpoint stop as that was the issue raised by the case. The emphasis on questioning, however, was not intended to exclude all other nonverbal conduct by border patrol agents. Instead, an agent's nonverbal conduct during a checkpoint inspection is viewed under the Fourth Amendment balancing test and ultimate standard of reasonableness.

■ The Supreme Court has spoken, in general terms, on the extent of nonverbal conduct permissible at a routine checkpoint stop. A routine checkpoint stop includes a visual inspection of the vehicle, but the inspection "is limited to what can be seen without a search." *Martinez–Fuerte,* 428 U.S. at 558, 96 S.Ct. at 3083. In order to search a vehicle at a traffic checkpoint, agents must have probable cause or consent. *United States v. Ortiz,* 422 U.S. 891, 896–97, 95 S.Ct. 2585, 2589, 45 L.Ed.2d 623 (1975). The question, therefore, is whether Agent Pena's actions constituted an unlawful search or a permissible visual inspection.[9] We hold it was the latter.[10]

■ Since the Supreme Court has not attempted to define what constitutes an automobile search at a border checkpoint, *See Ortiz,* 422 U.S. at 897 n. 3, 95 S.Ct. at 2589 n. 3, we take guidance from the relevant search and seizure law. A "[s]tate's intrusion into a particular area, whether in an automobile or

elsewhere, cannot result in a Fourth Amendment violation unless the area is one in which there is a 'constitutionally protected reasonable expectation of privacy.'" *New York v. Class,* 475 U.S. 106, 112, 106 S.Ct. 960, 965, 89 L.Ed.2d 81 (1986) (quoting *Katz v. United States,* 389 U.S. 347, 360, 88 S.Ct. 507, 516, 19 L.Ed.2d 576 (1967) (Harlan, J., concurring)). Moreover, an individual has a lesser expectation of privacy in an automobile, than in a residence. *Id.* 475 U.S. at 112–13, 106 S.Ct. at 965; *Martinez–Fuerte,* 428 U.S. at 561, 96 S.Ct. at 3084. Thus, an examination of the exterior of a car does not constitute a search as it is "thrust into the public eye." *Class,* 475 U.S. at 114, 106 S.Ct. at 966. Likewise, there is no legitimate expectation of privacy in a car's interior if an officer looks through the car's window and observes contraband in plain view. *Texas v. Brown,* 460 U.S. 730, 739–40, 103 S.Ct. 1535, 1542, 75 L.Ed.2d 502 (1983).

We find the brief visual examination of the vehicle's undercarriage was not a search, but part of a valid routine checkpoint stop. Our finding is consistent with the recent Tenth Circuit opinion in *United States v. Gonzalez–Acosta,* 989 F.2d 384, 388 (10th Cir.1993). The undercarriage is part of the car's exterior, and as such, is not afforded a reasonable expectation of privacy. The fact that Agent Pena knelt down to look under the car does not alter this finding. An officer may shift his position to obtain a better vantage point without transforming a visual inspection into a search, even though the agent's purpose is to look for contraband. *See generally California v. Ciraolo,* 476 U.S. 207, 213, 106 S.Ct. 1809, 1812, 90 L.Ed.2d 210 (1986) (an officer may make observations directed at identifying the presence of contraband from a "vantage point where he has a right to be"); *Brown,* 460 U.S. at 740, 103 S.Ct. at 1542 (the fact that an officer changed his position and bent down at an angle to look inside the Appellees' car is irrelevant to Fourth Amendment analysis). If, however, Agent Pena had disturbed or moved parts of the car in order

---

**9.** The government does not contend, nor did the district court find, that Agent Pena had probable cause or consent when he looked under the Appellees' car.

**10.** It is unnecessary for us to address the government's contention that the Appellees' nervous behavior gave rise to "reasonable suspicion."

to facilitate his observations, then such actions might constitute a search. *See Arizona v. Hicks,* 480 U.S. 321, 322, 107 S.Ct. 1149, 1150, 94 L.Ed.2d 347 (1987) ("A truly cursory inspection—one that involves merely looking at what is already exposed to view, *without disturbing it*—is not a 'search' for Fourth Amendment purposes." (Emphasis added)). In this instance, Agent Pena observed only what was in plain view.

Crawling under the vehicle did not significantly add to the intrusiveness of the routine checkpoint stop. Agent Pena's conduct was no more intrusive than if he had questioned the Appellees concerning the suspicious circumstances. The inspection of the vehicle's undercarriage lasted less than two minutes and did not involve more intrusive, time-consuming measures such as putting the car on a lift to obtain a better view.

The Appellees urge that the use of a flashlight and mirror to inspect the undercarriage constituted a search. We disagree. "[T]he use of artificial means to illuminate a darkened area simply does not constitute a search, and thus triggers no Fourth Amendment protection." *Brown,* 460 U.S. at 740, 103 S.Ct. at 1542. Consequently, Agent Pena's use of a flashlight did not transform his observations into an unreasonable search within the meaning of the Fourth Amendment. *United States v. Dunn,* 480 U.S. 294, 305, 107 S.Ct. 1134, 1141, 94 L.Ed.2d 326 (1987); *Brown,* 460 U.S. at 739–40, 103 S.Ct. at 1542. Likewise, we find Agent Pena's use of a mirror to reflect and direct the flashlight's beam did not, by itself, constitute a search as the mirror was simply used as an artificial means of optical enhancement.

Our holding that Agent Pena's inspection of the vehicle's undercarriage did not constitute a search is consistent with *United States v. Price,* 869 F.2d 801 (5th Cir.1989). In *Price,* border patrol agents noticed burn marks and bare steel at the corners of a truck bed in a vehicle detained at secondary inspection. *Id.* at 803. The agents looked under the vehicle and observed what appeared to be a storage compartment. An agent then crawled under the vehicle, and with the aid of a flashlight, looked into a small hole in the compartment and observed wrapping tape. A subsequent search of the compartment uncovered bundles of cocaine wrapped in tape. The Fifth Circuit found the agent's observations under the truck were part of a valid visual inspection and once the hidden compartment was discovered, the agents had probable cause to search it. *Id.* at 804.

In summary, the Appellees were not detained at the secondary inspection area in violation of their Fourth Amendment rights but instead were lawfully referred to secondary during the course of a routine checkpoint stop. Furthermore, Agent Pena's examination of the vehicle's undercarriage did not constitute a search and thus did not violate the Appellees' Fourth Amendment rights. Since there is no objection to either the canine inspection or the search of the hidden compartment, we do not address these issues.

We **REVERSE** the district court and **REMAND** for further proceedings consistent with this opinion.