# IN THE SUPREME COURT OF THE STATE OF NEW MEXICO

**Opinion Number:_____**

**Filing Date:  May 28, 2015**

**NO. 34,516**

**STATE OF NEW MEXICO,**

 Plaintiff-Petitioner,

v.

**AIDE ZAMORA SANCHEZ,**

 Defendant-Respondent.

**ORIGINAL PROCEEDING ON CERTIORARI**
**Fernando R. Macias, District Judge**

Hector H. Balderas, Attorney General
James W. Grayson, Assistant Attorney General
Corinna Laszlo-Henry, Assistant Attorney General
Santa Fe, NM

for Petitioner

Jorge A. Alvarado, Chief Public Defender
Allison H. Jaramillo, Assistant Appellate Defender
Santa Fe, NM

for Respondent



Jones, Snead, Wertheim & Clifford, P.A.
Jerry Todd Wertheim
Albuquerque, NM

Barbara E. Bergman
Albuquerque, NM

Theresa M. Duncan
Albuquerque, NM

for Amicus Curiae New Mexico Criminal Defense Lawyers Association

**OPINION**

**CHÁVEZ, Justice.**

**{1}** Defendant-Respondent Aide Sanchez (Sanchez) was at the Santa Teresa, New Mexico port of entry, an international border crossing, attempting to enter the United States from Mexico, when Border Patrol agents seized marijuana from her van. In *State v. Cardenas-Alvarez*, 2001-NMSC-017, ¶ 1, 130 N.M. 386, 25 P.3d 225, we held that "the New Mexico Constitution and laws apply to evidence seized by federal agents at a border patrol checkpoint [located] sixty miles within the State of New Mexico [(an interior fixed checkpoint)] when that evidence is proffered in state court." We also held that Article II, Section 10 of the New Mexico Constitution "demands that after a Border Patrol agent has asked about a motorist's citizenship and immigration status, and has reviewed the motorist's documents, any further detention requires reasonable suspicion of criminal activity." *Cardenas-Alvarez*, 2001-NMSC-017, ¶¶ 12, 20.

**{2}** Sanchez successfully moved to suppress the evidence seized from her van, arguing that (1) *Cardenas-Alvarez* applies at the international border, and (2) seizure of the marijuana violated the New Mexico Constitution because the Border Patrol agents did not have a reasonable suspicion of criminal activity to continue to detain her once they had established her citizenship and immigration status. We hold that

Article II, Section 10 does not afford greater protections at an international border checkpoint because unlike motorists who are stopped at interior border checkpoints, all motorists stopped at international fixed checkpoints are known to be international travelers who are not entitled to the heightened privacy expectations enjoyed by domestic travelers. We therefore reverse the district court's order suppressing the evidence in this case.

**BACKGROUND**

{3}     On January 2, 2012, United States Customs and Border Protection Officer Erica Pedroza (Pedroza) was working as the primary officer at the Santa Teresa Port of Entry, an international border checkpoint. Primary officers are the first customs agents to speak with a motorist seeking to cross an international border. They check motorists' citizenship documentation and inspect their vehicles for contraband. Primary officers usually have, at most, 30 seconds to decide between releasing a motorist or referring the motorist to a secondary area for further inspection of the vehicle. Further inspections arise for various reasons, including documentation deficiencies such as the lack of a passport, the presence of agricultural products, and evidence that vehicles have been tampered with.

{4}     Pedroza testified that while she was working, she encountered Sanchez driving

a van. According to Pedroza, Sanchez claimed that she had spent the weekend in Ciudad Juárez, Mexico and was driving back to Denver, Colorado. Pedroza also stated that Sanchez produced valid documentation of her legal status as a permanent resident. However, Pedroza was unable to inspect the van to her satisfaction because of the presence of a large dog within the van. Consequently, Pedroza referred Sanchez to a secondary area to have the vehicle inspected, even though Pedroza did not suspect any criminal activity.

{5}     Customs and Border Protection Officer Monica Pantoja (Pantoja) testified that she performed a seven-point inspection of Sanchez's van, which is an inspection of the whole vehicle. As part of this inspection, a drug-sniffing canine located marijuana within Sanchez's van.

{6}     Sanchez was indicted for distribution of marijuana in violation of NMSA 1978, Section 30-31-22(A)(1)(a) (2011) and conspiracy to commit distribution of marijuana in violation of NMSA 1978, Section 30-28-2 (1979). Sanchez filed a motion to suppress the evidence, arguing that under *Cardenas-Alvarez*, Pedroza lacked the reasonable suspicion of criminal activity required by the New Mexico Constitution to prolong her detention. In *Cardenas-Alvarez* we held that Article II, Section 10 applies to evidence seized at an interior fixed checkpoint "sixty miles within the State

3

of New Mexico when that evidence is proffered in state court." 2001-NMSC-017, ¶ 1. Under *Cardenas-Alvarez*, in the context of an interior fixed checkpoint, Article II, Section 10 "demands that after a Border Patrol agent has asked about a motorist's citizenship and immigration status, and has reviewed the motorist's documents, any further detention requires reasonable suspicion of criminal activity." 2001-NMSC-017, ¶ 20. The district court granted Sanchez's motion to suppress, finding that Pedroza's referral of Sanchez for a secondary inspection of the van was not supported by reasonable suspicion of criminal activity. The district court excluded "all evidence obtained and seized from [Sanchez] and her vehicle, following the referral of [Sanchez] for a secondary inspection."

{7} The Court of Appeals affirmed the district court, holding that *Cardenas-Alvarez* applies, irrespective of the location of the checkpoint. *State v. Sanchez*, No. 32,994, mem. op. ¶¶ 1-3, 8 (N.M. Ct. App. Nov. 6, 2013) (non-precedential). The Court of Appeals then concluded that "the facts relied upon by the State neither establish that issues of residence or citizenship were unresolved when [Sanchez] was sent to the secondary inspection area nor that there was any basis for a reasonable suspicion of wrongdoing at that time." *Id.* ¶ 6.

{8} We granted the State's petition for writ of certiorari, *State v. Sanchez*, 2014-

4

NMCERT-002, to address two issues:

> 1) Whether the protections of Article II, Section 10 of the New Mexico Constitution extend to the international border, and, if so, whether referral of [Sanchez] to a secondary area for continuation of routine questioning requires individualized suspicion[, and]

> 2) Whether the application of the interstitial approach in *Cardenas-Alvarez* should be revisited.

We decline to interpret Article II, Section 10 as requiring individualized reasonable suspicion of criminal activity for prolonging detentions at an international border checkpoint. We also decline to revisit the approach taken in *Cardenas-Alvarez*, because *Cardenas-Alvarez* is not implicated in this case.

**DISCUSSION**

{9} All of the issues presented in this case are reviewed de novo. "Whether the exclusionary rule under Article II, Section 10 . . . applies to the use of evidence in a New Mexico state court proceeding when that evidence resulted from a search conducted by federal border-patrol agents is a threshold constitutional issue that is subject to de novo review." *State v. Snyder*, 1998-NMCA-166, ¶ 6, 126 N.M. 168, 967 P.2d 843. If a constitutional provision applies, claims arising under it are also reviewed de novo. *State v. Brown*, 2006-NMSC-023, ¶ 8, 139 N.M. 466, 134 P.3d 753; *see also Cardenas-Alvarez*, 2001-NMSC-017, ¶ 6 ("The constitutionality of a

5

search or seizure is a mixed question of law and fact and demands de novo review.").

{10}     In *Cardenas-Alvarez*, we held that the New Mexico Constitution applies to evidence seized by federal agents at an interior fixed checkpoint when the State seeks to introduce the evidence in state court criminal proceedings.   2001-NMSC-017, ¶ 20.   The question remains whether the greater protections that exist at an interior fixed checkpoint also exist at the international border checkpoint.   To answer this question, we apply the interstitial approach announced in *State v. Gomez*, 1997-NMSC-006, ¶¶ 19-22, 122 N.M. 777, 932 P.2d 1.

{11}     Under the interstitial approach,

> the court asks first whether the right being asserted is protected under the federal constitution.  If it is, then the state constitutional claim is not reached.  If it is not, then the state constitution is examined.  A state court adopting this approach may diverge from federal precedent for three reasons:  a flawed federal analysis, structural differences between state and federal government, or distinctive state characteristics.

*Id.* ¶ 19 (citations omitted).

{12}     The Fourth Amendment of the United States Constitution provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against *unreasonable* searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause . . . ."  (Emphasis added.)  Article II, Section 10 of the New Mexico Constitution provides that "[t]he people shall be secure in their persons,

papers, homes and effects, from unreasonable searches and seizures . . . ." Article II, Section 10 parallels the federal Fourth Amendment and embodies "the fundamental notion that *every person in this state* is entitled to be free from unwarranted governmental intrusions." *State v. Gutierrez*, 1993-NMSC-062, ¶ 46, 116 N.M. 431, 863 P.2d 1052 (emphasis added).

## I.      The United States Constitution was not violated

{13}      The events in this case occurred at an international border checkpoint, not at an interior fixed checkpoint. "This is an important distinction as a citizen's Fourth Amendment rights at a checkpoint located on the border . . . are significantly less than inside the border." *United States v. Rascon-Ortiz*, 994 F.2d 749, 752 n.4 (10th Cir. 1993). The federal government's "interest in preventing the entry of unwanted persons and effects is at its zenith at the international border." *United States v. Flores-Montano*, 541 U.S. 149, 152 (2004). Therefore, "the Fourth Amendment's *balance of reasonableness is qualitatively different* at the international border than in the interior." *United States v. Montoya de Hernandez*, 473 U.S. 531, 538 (1985) (emphasis added).

{14}      Customs officers are afforded "great latitude in conducting a search at an international border crossing," *Klein v. United States*, 472 F.2d 847, 849 (9th Cir.

1973), and "may conduct routine searches of persons and effects crossing the border even in the absence of individualized suspicion." *United States v. Ezeiruaku*, 936 F.2d 136, 140 (3d Cir. 1991); *see also Montoya de Hernandez*, 473 U.S. at 538 ("Routine searches of the persons and effects of entrants are not subject to any requirement of reasonable suspicion, probable cause, or warrant . . . ."). During these routine searches, "[t]he primary inspector's job is to make a preliminary determination [of] whether an entrant . . . should be allowed beyond the customs line." *United States v. Salas-Camacho*, 859 F.2d 788, 791 (9th Cir. 1988). "The secondary inspector is called upon to act when a vehicle is referred for additional inspection" and is responsible for "conduct[ing] a more searching examination." *Id.* "Referral to a secondary checkpoint . . . is considered to be routine border inspection procedure." *United States v. Ledezma-Hernandez*, 729 F.2d 310, 313 (5th Cir. 1984). Thus, suspicion of illicit activities is not required to refer a motorist from a primary to a secondary area. *See id.* Routine searches include "patdowns, frisks, luggage searches, and automobile searches." *United States v. Whitted*, 541 F.3d 480, 485 (3d Cir. 2008). These types of searches conducted at an international border checkpoint "have been considered to be 'reasonable' by the single fact that the person or item in question had entered into our country from outside." *United States v. Ramsey*, 431

U.S. 606, 619 (1977).

{15}     "The border search doctrine is also applicable to stops and searches conducted at the 'functional equivalent' of the border, i.e., the first point at which an entrant may practically be detained." *United States v. Cardenas*, 9 F.3d 1139, 1147 (5th Cir. 1993); *see also Almeida-Sanchez v. United States*, 413 U.S. 266, 272 (1973). Searches at the functional equivalents of borders are "those searches that, although not conducted at the actual physical border, take place after a border crossing at the first practicable detention point." *United States v. Garcia*, 672 F.2d 1349, 1365 (11th Cir. 1982). "Such searches are truly border searches because their sole justification is the fact that the border has been crossed." *Id.* For example, "a search of the passengers and cargo of an airplane arriving at a St. Louis airport after a nonstop flight from Mexico City would clearly be the functional equivalent of a border search." *Almeida-Sanchez*, 413 U.S. at 273.

{16}     However, there is another federal doctrine concerning "the constitutionality of vehicle stops conducted *within* U.S. borders." *Garcia*, 672 F.2d at 1359 (emphasis added); *see United States v. Martinez-Fuerte*, 428 U.S. 543 (1976). These cases "did not apply the functional-equivalent theory," *Garcia*, 672 F.2d at 1359, because "the distance of the Border Patrol checkpoints from the Mexican border . . . dissuaded the

9

[United States Supreme] Court from applying the border-search rationale." *Id*. at 1360 n.14. This doctrine permits "brief warrantless stops of vehicles at permanent checkpoints absent any suspicion" of illicit activity. *Id.* at 1359. We will refer to the line of cases supporting stops within the United States border as the federal "interior fixed-checkpoint doctrine."

{17}     The interior fixed-checkpoint doctrine considers "the formidable law enforcement problems of the Border Patrol in attempting to control the flow of illegal aliens into this country, and balance[s] this governmental interest against the degree of interference with individuals' fourth  amendment rights caused by the stop or search procedure at issue in each case." *Garcia*, 672 F.2d at 1359-60 (internal quotation marks and citation omitted).

{18}     Under the interior fixed-checkpoint doctrine,

> [a] detention at a border checkpoint is a seizure under the Fourth Amendment. However, because the public has a substantial interest in protecting the integrity of our national borders, and the intrusion upon one's right to privacy and personal security by a routine border inspection is minimal, a border patrol agent may briefly detain and question an individual without any individualized suspicion . . . . The Fourth Amendment protects an individual's liberty at a border checkpoint by limiting the scope of the detention.

*Rascon-Ortiz*, 994 F.2d at 752 (footnote and citations omitted). As part of a routine interior fixed-checkpoint stop, "border patrol agents may direct motorists from the

10

primary inspection area to secondary without individualized suspicion and have wide discretion in selecting the motorists to be diverted." *Id.* (internal quotation marks and citation omitted). "Any further detention must be based on consent or probable cause." *Martinez-Fuerte*, 428 U.S. at 567 (alterations and internal quotation marks omitted) (quoting *United States v. Brignoni-Ponce*, 422 U.S. 873, 882 (1975)).

{19} Routine interior fixed-checkpoint stops generally involve "questions concerning the motorist's citizenship or immigration status, and a request for documentation." *Rascon-Ortiz*, 994 F.2d at 752. "A cursory visual inspection of the vehicle is also routine, and a few brief questions concerning such things as vehicle ownership, cargo, destination, and travel plans may be appropriate if reasonably related to the agent's duty to prevent" illegal immigration and the smuggling of contraband. *Id.* (citation omitted). However, "neither the vehicle nor its occupants" can be searched as part of a "routine inquiry," and the "visual inspection of the vehicle is limited to what can be seen without a search." *United States v. Ludlow*, 992 F.2d 260, 264 (10th Cir. 1993). Thus, the routine stops permitted under the interior fixed-checkpoint doctrine are less intrusive upon travelers' privacy than the routine searches permitted at an international border checkpoint under the border search doctrine. *Compare Whitted*, 541 F.3d at 484-85 (discussing the scope of

routine searches allowed under the border search doctrine), *with Ludlow*, 992 F.2d at 263-64 (discussing the scope of routine inquiries allowed under the interior fixed-checkpoint doctrine); *see also Rascon-Ortiz*, 994 F.2d at 752 n.4 ("[A] citizen's Fourth Amendment rights at a checkpoint located on the border, or its functional equivalent, are significantly less than inside the border.").

{20}     Because the search in this case occurred at an international border checkpoint, we analyze the constitutionality of the search under the border search doctrine and conclude that Sanchez's referral to a secondary area was a permissible part of a routine border search. *See Klein*, 472 F.2d at 849. Because the canine drug-sniff was performed during the course of this routine search, the drug-sniff was also permissible under federal law. *See United States v. Kelly*, 302 F.3d 291, 294-95 (5th Cir. 2002) (holding that the use of a trained canine to sniff a pedestrian entering the United States is a permissible part of a routine border search, even without a showing of individualized suspicion of illicit activity).

{21}     The parties agree that the federal constitution does not confer upon Sanchez the right to be free of prolonged detention, even if the detaining officer lacked reasonable suspicion of illicit activities. Because there was no federal constitutional violation, we proceed to the state constitutional claim. *See Gomez*, 1997-NMSC-006, ¶ 19.

**II.    There are no reasons to diverge from the federal border search doctrine**

{22}    Under New Mexico law, we "may diverge from federal precedent for three reasons:  a flawed federal analysis, structural differences between state and federal government, or distinctive state characteristics"; this is also known as the interstitial approach.  *See id.*  We do not detect a flaw in the federal analysis concerning the border search doctrine.  A rule that more robustly curbs the ability of law enforcement to conduct border searches "would frustrate the customary examinations conducted by customs officials as normal incidents of the meeting of their responsibilities." *Blefare v. United States*, 362 F.2d 870, 884 (9th Cir. 1966).  The border search doctrine thus acknowledges the "exigencies present and the vital national interest demanding the regulation of who and what traverse our borders." *Blefare*, 362 F.2d at 884.

{23}    As in *Cardenas-Alvarez*, we also conclude that there are no structural differences between state and federal governments so as to require a departure from federal precedent.  2001-NMSC-017, ¶ 14.  Moreover, Sanchez does not argue that structural differences should warrant a departure.  She contends instead that "New Mexico law provides several distinctive characteristics that require departure."

{24}    Sanchez contends that New Mexico has distinctively provided heightened

protections from searches and seizures "in both the automobile context and in the border context." She urges us to extend *Cardenas-Alvarez* to hold that Pedroza violated Article II, Section 10 when she referred Sanchez to a secondary area of an international border checkpoint to complete the inspection of Sanchez's van. *Cardenas-Alvarez* relied upon "the extra layer of protection that New Mexico offers its motorists" to justify heightened search and seizure protections at *interior fixed checkpoints*. *Id.* ¶¶ 1, 16. Thus, Sanchez would have us hold that the scope of travelers' rights at international border checkpoints are identical to the scope of rights at interior fixed checkpoints.

{25} *Cardenas-Alvarez* concerned stops at interior fixed checkpoints, and it accordingly analyzed the facts of the case under the *interior fixed-checkpoint doctrine*. *Id.* ¶¶ 1-2, 16. New Mexico has rejected the "notion that an individual lowers his [or her] expectation of privacy when he [or she] enters an automobile, and elected instead to provide motorists with a 'layer of protection' from unreasonable searches and seizures that is unavailable at the federal level." *Id.* ¶ 15 (citation omitted). "Therefore, in New Mexico, we . . . proscribe the prolongation of [an interior fixed-]checkpoint stop once questions regarding citizenship and immigration status have been answered, unless the officer conducting the stop reasonably suspects

14

the defendant of criminal activity." *Id.* ¶ 16. In contrast, under the federal interior fixed-checkpoint doctrine, "questions regarding travel plans and the referral of a defendant from primary to secondary part of a routine border checkpoint stop . . . require[] no suspicion of criminal activity . . . ." *Id.*

{26} While *Cardenas-Alvarez* departed from the federal interior fixed-checkpoint doctrine, it did not analyze the federal border search doctrine. *See generally id.* "The general rule is that cases are not authority for propositions not considered." *Fernandez v. Farmers Ins. Co. of Arizona*, 1993-NMSC-035, ¶ 15, 115 N.M. 622, 857 P.2d 22 (internal quotation marks and citations omitted). Consequently, *Cardenas-Alvarez* cannot be read as modifying the federal border search doctrine, which is implicated by the facts of this case. We therefore determine whether the extra layer of protection afforded to New Mexico motorists mandates departure from the federal *border search doctrine.*

{27} Determining the permissibility of a search or seizure involves balancing governmental interests with the individual's right to privacy. *See Montoya de Hernandez*, 473 U.S. at 539-40. When individuals engage in certain courses of action, their privacy interests may be diminished within the context of a permissible search or seizure. *See Almeida-Sanchez*, 413 U.S. at 271. For example, when a gun

dealer "chooses to engage in [a] pervasively regulated business and to accept a federal license, he [or she] does so with the knowledge that his [or her] business records, firearms and ammunition will be subject to effective inspection." *Id.* Likewise, an individual who presents himself or herself at an international border checkpoint for admission to the United States has a lesser expectation of privacy than he or she would have at an interior fixed checkpoint. *See Montoya de Hernandez*, 473 U.S. at 539.

{28}    We conclude that the extra layer of protection for motorists that New Mexico law provides is not a distinctive state characteristic that increases the individual's expectation of privacy at an international border checkpoint. *Cardenas-Alvarez* was premised on the fact that motorists in New Mexico have a greater expectation of privacy than that which is protected by federal law at interior fixed checkpoints. 2001-NMSC-017, ¶¶ 15-16. "Since not all individuals that are required to stop at a permanent checkpoint have been outside the United States but are New Mexico motorists lawfully traveling on New Mexico's highways, New Mexico has an interest in providing some protection to individuals who are compelled to pass through a checkpoint." *Id.* ¶ 53 (Baca, J., concurring in the result); *see also Carroll v. United States*, 267 U.S. 132, 154 (1925) ("[T]hose lawfully within the country, entitled to use

16

the public highways, have a right to free passage without interruption or search unless there is known to a competent official, authorized to search, probable cause for believing that their vehicles are carrying contraband or illegal merchandise."). However, traffic passing through an international border checkpoint is international in nature, not domestic. *See United States v. Jackson*, 807 F.2d 1185, 1192 (5th Cir. 1986) (Reavley, J., specially concurring) ("[S]earches conducted at locations functionally equivalent to a border interdict the same kind of traffic stopped at our nation's borders: international traffic."), *aff'd on reh'g*, 825 F.2d 853 (5th Cir. 1987). Thus, traffic passing through international border checkpoints do not contain domestic travelers who have heightened expectations of privacy that are idiosyncratic to the state in which they are traveling; all international travelers have a lessened expectation of privacy because they present themselves at the border for entry into the United States. *See Montoya de Hernandez*, 473 U.S. at 539-40 ("[N]ot only is the expectation of privacy less at the border than in the interior, the Fourth Amendment balance between the interests of the Government and the privacy right of the individual is also struck much more favorably to the Government at the border." (citations omitted)). Thus, the extra layer of protection that vindicates the privacy interests of domestic travelers is not implicated at international border checkpoints.

We therefore decline to depart from the federal border search doctrine.

{29} We also note that fighting illegal immigration and smuggling present significant problems for federal law enforcement. *See, e.g.*, *Montoya de Hernandez*, 473 U.S. at 538 ("These cases reflect longstanding concern for the protection of the integrity of the border. This concern is, if anything, heightened by the veritable national crisis in law enforcement caused by smuggling . . . illegal narcotics . . . ."); *Martinez-Fuerte*, 428 U.S. at 552 ("Interdicting the flow of illegal entrants . . . poses formidable law enforcement problems."). Differences between state and federal search and seizure rules create "very serious and, in some cases, seemingly insoluble problems for law enforcement officials." James W. Diehm, *New Federalism and Constitutional Criminal Procedure: Are We Repeating the Mistakes of the Past?*, 55 Md. L. Rev. 223, 263 (1996). Such problems include the generation of choice of law issues and the prospect of increasing litigation. *See id.* at 250-55. Therefore, we conclude that departing from the federal border search doctrine would exacerbate law enforcement issues at the international border.

{30} The United States Supreme Court has stated that "[t]here is no war between the [United States] Constitution and common sense." *Mapp v. Ohio*, 367 U.S. 643, 657 (1961), *limited on other grounds by United States v. Leon*, 486 U.S. 897, 906, 928

(1984). Likewise, there is no need for the New Mexico Constitution to conflict with common sense. "Federal-state cooperation in the solution of crime under constitutional standards will be promoted, if only by recognition of their . . . mutual obligation to respect the same fundamental criteria in their approaches." *Id.* at 658. Our refusal to depart from the federal border search doctrine acknowledges the significant law enforcement problems at an international border checkpoint where it is known that a motorist is entering from outside the country, thereby vindicating common sense and furthering federal-state cooperation.

**CONCLUSION**

{31}     We reverse the decision of the Court of Appeals in *Sanchez*, Ct. App. No. 32,994, and also reverse the district court's suppression of the evidence.

{32}     **IT IS SO ORDERED.**


_____
**EDWARD L. CHÁVEZ, Justice**


**WE CONCUR:**



_____
**BARBARA J. VIGIL, Chief Justice**

19

_____

**PETRA JIMENEZ MAES, Justice**

_____

**RICHARD C. BOSSON, Justice**

_____

**CHARLES W. DANIELS, Justice**

20